UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: JON T. HOLMES,                          Bankr. No. 07-43440
                                               Chapter 7
        Debtor                                 HON. MARCI B. MCIVOR
_____/

JON T. HOLMES,

        Defendant/Appellant,                   Adversary Proceeding No. 07-05811

vs.                                            Civil Action No. 08-CV-13858
                                               HON. BERNARD A. FRIEDMAN
NATIONAL CITY BANK,

        Plaintiff/Appellee.
_____/


**OPINION AND ORDER AFFIRMING BANKRUPTCY COURT'S
GRANT OF SUMMARY JUDGMENT FOR NATIONAL CITY BANK**


        This matter is presently before the court on the debtor's appeal of an order of the

Bankruptcy Court granting summary judgment in an adversary proceeding for one of his creditors,

National City Bank ("NCB").  For the reasons explained below, the court shall affirm the

Bankruptcy Court's ruling.


*Background*

        The debtor, Jon Holmes, filed a Chapter 7 bankruptcy petition in February 2007.

Among the debts Holmes listed in his petition is $1,322,947.47 owed to NCB.  In May 2007, NCB

commenced the instant adversary proceeding to obtain a determination that pursuant to 11 U.S.C.

§§ 523(a)(2)(A), 523(a)(2)(B) and/or 523(a)(4), this debt is not dischargeable.  Holmes incurred the

debt by taking out two loans with NCB, a $500,000 "Equity Reserve" line of credit in August 2005 and an $800,000 "Complete Loan" in October 2005.  NCB alleged that Holmes obtained these loans by misrepresenting his income and assets.  In particular, NCB alleged that Holmes claimed to have been employed by Lion Pride Investment Group for five years and that his gross monthly pay was $183,900, whereas in fact Holmes worked as a personal trainer and earned $50,000 per year.  NCB further alleged that Holmes had falsely represented, in both the loan applications and supporting documentation (e.g., tax returns and bank statements), that he owned more than $3 million in cash assets and that his annual gross income exceeded $2 million.  Holmes answered the complaint by generally denying, or claiming to lack knowledge about, all of NCB's substantive allegations.

During discovery NCB served Holmes with a number of requests for admissions. Holmes admitted that he signed the Equity Reserve Agreement underlying the $500,000 loan, the Future Advance Mortgage that secured the $500,000 loan, the Future Advance Mortgage that secured the $800,000 loan, and the application for the $500,000 loan,[1] but asserted as to all of these documents that he "did not read the document prior to signing it."[2]  Holmes also admitted that he signed the Loan Disbursement Authorization, which authorized NCB to disburse the proceeds of the $800,000 loan into his credit account, although he was "unable to admit or deny if the information on the document was there when he signed it as he cannot recall what was on the document when

---

[1] On this application, Holmes indicated that his address was 2785 Cranbrook Ridge Ct., Rochester Hills, Michigan; that this had been his address for six months; and that the property had an estimated market value of $5.4 million and a mortgage balance of $3.78 million.  Holmes also indicated on this application that he had worked for LionPride Investment Group for five years and was earning gross monthly pay in the amount of $183,900.

[2] Holmes would neither admit nor deny having signed the note for the $800,000 loan, "as the document provided does not have his signature on it and he did not read the document prior to signing it."

he signed it." Holmes denied that he submitted to NCB any of the following documents which supported his loan applications: a personal financial statement dated August 8, 2005[3]; two statements from TCF Bank, dated May and June 2005, showing Holmes had a checking account balance of approximately $3 million; a $1.5 million personal loan application dated August 8, 2005; Holmes' 2003 and 2004 federal income tax returns showing adjusted gross income of approximately $2.2 million for each year; 2003 and 2004 W-2 forms from LionPride Investment Group, Inc., showing that wages in the amount of approximately $2.2 million were paid to Holmes each year; and two payroll statements from LionPride Investment Group, Inc., dated July 2005, showing that bi-weekly wages were paid to Holmes in the amount of $92,744. While the personal financial statement and the $1.5 million personal loan application are signed "Jon T. Holmes," Holmes denies the signatures on these documents are his.

At the meeting of creditors in March 2007, Holmes testified that he was the victim of "a real estate scam" in which Phil Blevins, the owner of Lion Pride Investment, used Holmes' name and credit to obtain money and property. When questioned by counsel for NCB, Holmes testified that he was never employed by Lion Pride Investment Group; that he has never earned a monthly salary of $183,900 or an annual salary of $2.2 million; that he has never had cash assets worth $3 million; that he has never had any accounts with TCF Bank; that he has never owned a 2004 BMW or a 2003 Escalade; that he has never owned furniture, art or jewelry worth $650,000; and that he has never had any investment accounts with Fidelity or Comerica, as indicated on his

---

[3] This statement indicated, among other things, that Holmes (1) had cash assets worth over $3 million; (2) owned real estate worth over $5.6 million; (3) owned two luxury automobiles worth $156,000; (4) owned other assets such as furniture, jewelry and art worth $650,000; (5) earned a monthly salary of $183,900 and an annual salary of over $2.2 million; and (6) had been employed by LionPride Investment for 5.6 years as the Director of Operations.

tax returns.

On July 14, 2008, NCB moved for summary judgment on the grounds that the nondischargeability of the debt, under 11 U.S.C. §§ 523(a)(2)(A) and/or 523(a)(2)(B),[4] was established by the documents signed and/or submitted by Holmes.   On July 28, 2008, Holmes filed "Defendant's Answer to Trustee's Motion for Summary Judgment" [sic], which consisted of eight

_____

[4] These statutory provisions state:

### § 523.  Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

*   *   *

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing--

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; . . .

Although NCB's complaint and summary judgment motion also mentioned § 523(a)(4) as a basis for finding the debt at issue nondischargeable, only §§ 523(a)(2)(A) and 523(a)(2)(B) were argued.  At the hearing on this motion, NCB likewise relied solely on §§ 523(a)(2)(A) and 523(a)(2)(B).

one-sentence denials of liability and a two-page affidavit in which Holmes averred, essentially, that he was used by Blevins, that he did not defraud NCB, and that "the documents containing false information concerning my finances, income and assets that [NCB] claims it received were not made by me, . . . ." On August 21, 2008, Holmes filed a ten-page "Brief in Support of Debtor's Answer to National City Bank's Motion for Summary Judgment" and nine exhibits, including a lengthier affidavit by Holmes. Although this second brief was filed approximately three weeks late, the Bankruptcy Court denied NCB's motion to strike it. The theme of Holmes' expanded response and affidavit is that he "never intentionally provided false information to National City Bank and was not aware Blevins and [Blevins' co-conspirator] Haddad were falsely providing information to National City Bank in his name." Holmes argued that NCB was not entitled to summary judgment because (1) NCB failed to prove Holmes knowingly made any misrepresentations, and (2) NCB's reliance on the alleged misrepresentations was not justifiable or reasonable.

The Bankruptcy Court held a hearing on NCB's summary judgment motion. Counsel for NCB conceded that a factual dispute exists as to whether Holmes or Blevins provided NCB with some of the loan-related documents (e.g., the tax returns, the W-2 forms, and the bank statements) concerning Holmes' employment and creditworthiness. However, counsel for NCB argued that the nondischargeability of the debt could nonetheless be determined on summary judgment based on the documents Holmes acknowledged having signed and based on some of the averments contained in his affidavits. Holmes reiterated his arguments that he was a pawn in a fraudulent scheme perpetrated by Blevins, that Holmes himself did not make any fraudulent misrepresentations, and that NCB could have discovered the fraud if it had done a more thorough investigation into Holmes' background and therefore its reliance on any of the documents at issue in this case, whether or not

5

signed or submitted by Holmes, was unreasonable.

In a lengthy and thorough bench ruling, the Bankruptcy Court granted NCB's summary judgment motion and found the debt to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).[5]  In relevant part, the court stated:

> A creditor has the burden of proving by a preponderance of the evidence that a debt is nondischargeable under 523(a)(2)(A). In re McManus, 292 B.R. 157, citing Grogan v. Garner, 498 U.S. 279. To prove that a debt is nondischargeable under 523(a)(2)(A), a creditor must prove the following elements: one, the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth; two, the debtor intended to deceive the creditor; three, the creditor justifiably relied on the false representation; and, four, its reliance was the proximate cause of the loss. . . .
>
> In this case, the Court finds that each of these elements has been met. First, this Court finds defendant obtained money through material misrepresentations that at the time he knew were false or made with gross recklessness as to their truth. Defendant signed four documents, a credit application, an equity reserve agreement, a future advance mortgage, and a real estate mortgage. Each of these documents contained material misrepresentations.
>
> In the credit application, defendant represented that his address was that of the Rochester home and that he had lived there for six months knowing that these representations were not true. Defendant also represented that for the past five years he was employed by Lion Pride; that his gross monthly pay was $183,900, again, knowing that these representations were not true. In truth, at the time defendant was employed by Lifetime Fitness as a trainer and actually earned approximately $50,000 per year. Even if some of those facts were subsequently added and defendant signed a credit application just that had his address on it, the address was false, and leaving a signed credit application when you're applying for a $500,000 loan blank certainly represents the level of recklessness required by the first prong of the test set forth in In re Rembert.
>
> In the equity reserve agreement, defendant agreed to pay a $500,000 line of credit. In fact, defendant had no intention of repaying the $500,000 according to the terms of the agreement.

---

[5] The court did not address the possible applicability of §§ 523(a)(2)(B) or 523(a)(4).

6

Defendant states in his brief that the loan could be made in Mr. Holmes' name since he had good credit, and then they could then flip the house for profit. Certainly, this was not the representation that was made when signing the credit agreement.

Defendant signed the future advance mortgage to secure repayment of the $500,000 line of credit and a separate mortgage to secure repayment of $800,000. Defendant misrepresented his ownership of the Rochester property when he signed the mortgages.

\*     \*     \*

This Court also finds that defendant made the misrepresentations with the intention of deceiving plaintiff. Defendant argues that he never intended to deceive plaintiff. The Court rejects defendant's argument. Defendant states in his affidavits that he had no intention of paying the notes back, at least not pursuant to those terms. The intention was that these funds would be provided when the house was flipped, but he had no intention at the time of complying with the agreements as they were set forth in the terms of those agreements.

\*     \*     \*

This Court also find that . . . the plaintiff – justifiably relied on defendant's false representations and that those representations were the proximate cause of plaintiff's loss. Defendant argues that plaintiff could easily have verified defendant's statements in the credit application and verified that those statements – the credit application were false.

Defendant also argues that many of the additional documents supplied to plaintiff, specifically the tax returns and the W-2's, were not supplied by defendant directly, and, therefore, to the extent that plaintiff relied on those additional documents, plaintiff's reliance was misplaced. Defendant started the scheme to defraud plaintiff in motion when he submitted his credit application. Plaintiff had no affirmative obligation to check the facts in the credit application or to verify the veracity of other documents supplied to plaintiff.

The Bankruptcy Court incorporated this bench ruling in a written order granting NCB's motion for summary judgment. Holmes timely appealed. The court has appellate jurisdiction pursuant to 28 U.S.C. § 158. The court reviews a Bankruptcy Court's factual findings

7

for clear error; its conclusions of law are reviewed *de novo*.  *See In re Cook*, 457 F.3d 561, 565 (6th Cir. 2006); *In re Musilli*, 398 B.R. 447, 452-53 (E.D. Mich. 2008).  Under Fed. R. Civ. P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Once a properly supported summary judgment motion has been filed, the burden shifts to the party opposing the motion to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  Viewing the evidence in the light most favorable to the opposing party, the court may grant summary judgment only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party.  *See Anderson*, 477 U.S. at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989).

Holmes argues that the Bankruptcy Court erred in concluding that no genuine issue of material fact exists as to whether (1) the bank justifiably relied upon a material misrepresentation made by Holmes, (2) Holmes made a material misrepresentation to the bank knowing it to be false, and (3) Holmes intended to deceive the bank.  Having reviewed the parties' briefs and the voluminous exhibits, the court concludes that the Bankruptcy Court did not err in granting summary judgment for NCB.

***Reliance***

8

As to the first issue, Holmes correctly notes that it is NCB's burden, in order to have the debt declared nondischargeable under § 523(a)(2)(A), to prove that it "justifiably relied" on a false misrepresentation by Holmes.[6] Holmes further notes, also correctly, that in *Field v. Mans*, 516 U.S. 59, 74-75 (1995), the Supreme Court held "that § 523(a)(2)(A) requires justifiable, but not reasonable, reliance." The Court rejected the lower courts' higher requirement of "reasonable reliance" which imposed on the creditor a duty to investigate. Instead, the Court held that a plaintiff-creditor must have "justifiably" relied on the defendant-debtor's misrepresentation, meaning that

> the plaintiff is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation can not offer as a defense the plaintiff's failure to make the investigation or examination to verify the same.

*Id.* at 72, *quoting* 1 F. Harper & F. James, *Law of Torts* § 7.12, pp., 581-83 (1956). In other words, "[i]t is only where, under the circumstances, the facts should be apparent to one of [the creditor's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." 516 U.S. at 71, *quoting* W. Prosser, *Law of Torts* § 108, p. 718 (4th ed. 1971). *See also In re Spadoni* 316 F.3d 56, 59 (1st Cir. 2003) (citing *Field* for the rule that "the circumstances of the reliance claim

---

[6] As the parties agree, and as the Bankruptcy Court noted, a creditor must prove: "(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." *In re Rembert*, 141 F.3d 277, 280-81 (6th Cir.1998). Additionally, "a creditor must prove each of these elements by a preponderance of the evidence [and] exceptions to discharge are to be strictly construed against the creditor." *Id.* at 281.

must be taken into account and that the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)"); *In re Biondo*, 180 F.3d 126, 135 (4th Cir. 1999) (citing *Field* for the proposition that a creditor has no duty to investigate a debtor's factual representations, even if the falsity easily could be discovered); *Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 74-75 (1st Cir. 1998) (citing *Field* for the proposition that "[a] party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation. . . . However, the reliance on misrepresentations known by the victim to be false or obviously false is not justified; falsity which could have been discovered by senses during a cursory glance may not be relied upon"); *In re Eashai*, 87 F.3d 1082, 1090-91 (9th Cir. 1996) (noting that under the reasonable reliance standard, "although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth").

Despite the clear holding of *Field*, Holmes argues that a "sophisticated creditor," such as a bank, does have a duty to investigate the background of an applicant for credit and that NCB did not investigate him adequately.  And, his argument continues, since NCB's investigation of him was insufficient, NCB's reliance in this case was not justifiable and § 523(a)(2)(A) does not prevent him from discharging the debt.  The cases Holmes cites do not support this proposition, nor are they factually similar to the present case.[7]  Holmes also argues that when "red flags" are present, a

---

[7] Holmes cites the following cases at this section of his brief; none of these cases were cited in Holmes' response to NCB's summary judgment motion or at oral argument.  *In re Boyd*, 322 B.R. 318 (Bankr. N.D. Ohio 2004), apparently is cited only for its quotation from *In re Kirsh*, 973 F.2d 1454, 1459 (9th Cir. 1992), that "if a person does have special knowledge, experience and competence he may not be permitted to rely on representations that an ordinary person would properly accept"; and for its quotation from *Field* that a creditor "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him."

Factually, *In re Boyd* bears no resemblance to the present case. *See infra* fn.8. *In re Harrison*, 301 B.R. 849 (Bankr. N.D. Ohio 2003), involved undocumented commercial loans between two businesses and has no possible application to the present case. *In re Alvi*, 191 B.R. 724 (Bankr. N.D. Ill. 1996), cited for its statement that "[a] creditor cannot sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation," was a credit card case bearing no resemblance to the present case; it is also "red-flagged" by Westlaw, making citation to it dubious for any proposition. *In re Stephens*, 302 B.R. 227, 236 (Bankr. N.D. Ohio 2003), cited for the proposition that a mere promise to repay a loan is "insufficient to create a finding of justifiable reliance," is another credit card case bearing no resemblance to the present case. *In re Bird*, 224 B.R. 622, 630 (Bankr. S.D. Ohio 1998), cited apparently for its finding that the creditor in that case "relied upon a lending practice which in our view stretches the limits of reasonable conduct," involved a bank that mailed – unsolicited – two $2,500 checks to the debtors, a scenario that bears no conceivable resemblance to the present case. *In re Willis*, 190 B.R. 866 (Bankr. W.D. Mo. 1996), cited for the proposition that "mere reliance on the Debtor's promise to repay was not justifiable," is another credit card case that bears no resemblance whatsoever to the present case, as the issue was whether the credit card issuer relied on the debtor's representation, impliedly made with each use of the card, that she would repay. *In re Meyer*, 296 B.R. 849, 863 (Bankr. N.D. Ala. 2003), cited for its statement that "[a]ny reliance by [the credit card issuer] on the implied representations made by the Debtor is unjustified, since even a cursory examination of her credit history would have revealed her actual financial situation," is yet another credit card case that bears no resemblance to the present case. *In re Etto*, 210 B.R. 734, 740 (Bankr. N.D. Ohio 1997), cited for its statement that "[i]n this Circuit, the law is clear that banks have a responsibility to conduct reasonable investigation of a debtor's finances prior to extending loans or credit," is another credit card case in which the credit card issuer sent the debtor an unsolicited, pre-approved credit card, without requiring the debtor to so much as complete an application; the case obviously bears no resemblance to the present case. *In re Akdogan*, 204 B.R. 90, 97 (Bankr. E.D.N.Y. 1997), is another credit card case in which the court found reliance lacking because the credit card issuer did not dispute the allegation that it "never conducted any investigation prior to extending credit and was in fact at all times utterly indifferent to [the debtor's] creditworthiness," circumstances bearing no resemblance to the present case. *In re McCreery*, 213 B.R. 689 (Bankr. N.D. Ohio 1997), cited for its statement that "[t]he Sixth Circuit [has] held that a lender shows reliance by having, at a minimum, evaluated the creditworthiness of the debtor and ordinary credit information about the debtor prior to extending credit," is yet another credit card case involving facts much different from those in the present case. *In re Ferrell*, 213 B.R. 680 (Bankr. N.D. Ohio 1996), cited for the proposition, *inter alia*, that "[a] lender must investigate creditworthiness and ferret out ordinary credit information," is yet another credit card case in which reliance was found to be lacking because the creditor extended credit based on an incomplete application, circumstances not comparable to those in the present case. And finally, *In re Catherman*, 331 B.R. 333 (Bankr. N.D. Ohio 2005), in which the court found reliance to be lacking due to the creditors' failure to conduct a "minimal level of investigation," is distinguishable from the present case because it involved a

11

creditor must investigate before lending, and several red flags should have caused NCB to do so in the present case.    This argument relates to the rule from *Field* that if a creditor "has discovered something which should serve as a warning that he is being deceived, . . . he is required to make an investigation of his own."  516 U.S. at 71, *quoting* W. Prosser, *Law of Torts* § 108, p. 718 (4th ed. 1971).  Yet the many "red flag" cases Holmes cites either do not stand for this proposition or are factually so different from the present case that they do not support his argument that NCB ignored any such warnings.[8]

---

debtor's oral promise to repay a loan from life insurance proceeds, and the creditors took no steps to verify that the debtor had named them as beneficiaries.

[8] Plaintiff cites the following "red flag" cases; none of these cases were cited in Holmes' response to NCB's summary judgment motion or at oral argument.  *In re Vann*, 67 F.3d 277 (11th Cir. 1995), did not involve "red flags" per se, but rather remanded for further proceedings because the bankruptcy court had required the creditor to prove "reasonable reliance" as opposed to "justifiable reliance."  *In re Sharp*, 2007 WL 2898704, at *4 (Bankr. D. Md. 2007), cited for the statement that "[w]here . . . the lender is sophisticated, the sums involved are significant, there is no history upon which the lender can rely and the only information that the lender has comes from the borrower, the lender cannot later be heard to complain that it was duped," is distinguishable because in deciding to make a loan the creditor relied on a financial statement and a title report, both of which were prepared by the debtor, unverified and stale by many months. *In re Grinaway*, 2008 WL 920313 (Bankr. D. N.J. 2008), is not a "red flag" case, but rather involved a billing dispute over a construction contract and bears no resemblance to the present case.  *In re Nicolai*, 2007 WL 405851, at *4 (Bankr. D. N.J. 2007), adds nothing to the debate but merely paraphrases *Field* for the proposition that justifiable reliance is lacking "[w]here a [creditor] admits that he was aware of the financial difficulties of a potential borrower and does nothing more than accept oral statements of a generalized intent to utilize the proceeds of a particular sale, . . . ."  *In re Sharpe*, 351 B.R. 409 (Bankr. N.D. Tex. 2006), in which the court found reliance to be lacking, the creditor made several personal loans to a friend she knew had a drug and alcohol problem, was financially unstable, and had told the creditor he was hiding assets from his wife during his divorce case, none of which is even remotely similar to the facts in the present case. *In re Webber*, 350 B.R. 344 (Bankr. S.D. Tex. 2006), had nothing to do with § 523(a)(2)(A) and is inapplicable.  *In re Boyd*, 322 B.R. 318 (Bankr. N.D. Ohio 2004), found reliance to be lacking because the creditor loaned money despite knowing that the debtor was in financial difficulties and that she had failed to repay a previous loan, none of which "red flags" exist in the present case. *Lewis v. Bank of America NA*, 343 F.3d 540 (5th Cir. 2003), had

The court notes that Holmes did not argue to the Bankruptcy Court, either in his response to NCB's summary judgment motion or at the oral argument on the motion, that any "red flags" should have prompted NCB to investigate further.  In both his response brief and at the hearing, Holmes limited his argument on the issue of reliance to suggesting that NCB *could have* taken steps to discover the fraud, not that there were any obvious errors or discrepancies in the loan applications and/or supporting documents which would have been apparent to NCB upon cursory review, thereby *requiring* it to investigate in order to show justifiable reliance under *Field*.  While Holmes' "red flags" argument therefore has been waived,[9] the court nonetheless shall decide it on the merits, as NCB has not objected to Holmes' development of the new argument on appeal.

The court rejects Holmes' argument that his loan application or associated documents raised any "red flags" that required NCB to inquire further than it did before extending the loans at issue in this case. The fact that NCB obtained significant documentation before extending the loans shows that it took positive steps to verify the statements contained in the loan applications and in

---

nothing to do with § 523(a)(2)(A) or with "red flags" that would alert a lender to investigate further before making a loan.  *In re Ladd*, 2006 WL 4470829 (Bankr. E.D. Okla. 2006), in which reliance was found to be unjustifiable, the court noted that the debtor's financial statements contained "glaring errors" which should have prompted the creditor to investigate.  Finally, *In re Lyle*, 334 B.R. 324, 335 (Bankr. D. Mass. 2005), cited for its statement that a creditor "may not act like an ostrich with its head in the sand," involved a dispute over a construction contract in which the creditors' reliance on the builder's license was found to be unjustifiable because he had shown them an expired license and they did not investigate further.

[9]   "[I]t is a long-standing principle of jurisprudence that an appellate court should not pass on issues not raised at the trial level."  *In re Charfoos*, 979 F.2d 390, 395 (6th Cir.1992). *See also In re Koenig Sporting Goods, Inc.*, 229 B.R. 388, 389 n.1 (6th Cir. BAP 1999) ("An argument is waived that is not first presented to the bankruptcy court"); *In re Haviaras*, 266 B.R. 792, 800 (N.D. Ohio 2001) ("issues not first litigated in the trial court are inappropriate for consideration on appeal").

Holmes' financial statement.  As noted above, these documents included bank statements, tax returns, W-2's, pay statements, and deeds showing Holmes' ownership of the Rochester Hills property.  Collectively, this documentation verified the statements Holmes made in his loan applications.  The bank also obtained mortgages in the Rochester Hills property to secure both loans.  Whether the bank should loan money to such a person is a matter left to the bank in the exercise of its business judgment.  The only issue before the court, under *Field*, is whether the bank disregarded obvious signs that it was being deceived.   On this record the court cannot say that it did.

Holmes' alleged "red flags" mainly go to whether the bank's business judgment in making the loans was sound, not to whether further investigation was required.  For example, Holmes points to his low credit score,[10] the size of the loan, and alleged discrepancies in his credit report.[11]  Other alleged "red flags" are unsupported by any citation to the record, including the allegations that NCB knew the loans would not be used for their intended purpose (i.e., home improvements) and that Holmes had already defaulted on the first loan when the bank approved the

---

[10] Holmes points to NCB's two "approval memos," one for each loan.  The first, dated August 25, 2005, states: "The Client's credit bureau revealed a Chapter 7 bankruptcy filing.  The Private Banker is aware of this as it relates to the Client's son filing for bankruptcy and this filing appearing on his father's credit report."  The second, dated October 7, 2005, states: "Empirica score is 597 due to a bankruptcy that was filed by his son.  Tony Denger provided a letter from Brady Muse, CPA, MBA, to verify that Mr. Jon T. Holmes Sr. has not filed for bankruptcy."  As Holmes did not argue to the Bankruptcy Court that his credit score should have been a "red flag," there is nothing in the record to support the argument other than the approval memos themselves, which show that NCB believed the score was due to Holmes' son having filed for bankruptcy and that NCB verified that Holmes himself had not done so.  The credit report is not so much a red flag as a red herring.

[11] Holmes attempts to create a discrepancy where none exists.  He notes that his credit report, dated April 25, 2005, showed total debts in the amount of $291,577, whereas NCB's approval memos found his total liabilities to be approximately $4 million.  The "discrepancy" is explained by the fact that Holmes purchased the Rochester Hills property in the interim and, as the approval memos note, Holmes had a $3.78 million mortgage on that property.

14

second loan.  Other alleged "red flags" are not red flags at all, but Holmes' suggestions as to additional steps NCB might have taken (but under *Field* was not required to take) in order to ferret out the fraud – e.g., conducting an "asset check" which would have disproved his claimed ownership of two luxury automobiles and asking him directly if the information he had provided was true.  The remaining "red flags" can only be characterized as grasps at straws – e.g., the suggestions that because Holmes had a chauffeur's license his claimed income was suspiciously high, and that because mortgage fraud had been widely publicized in local newspapers the bank should have suspected fraud in this case.

The court shall affirm the Bankruptcy Court's conclusion that NCB justifiably relied on Holmes' misrepresentations.  This is not a case in which the creditor relied blindly on obviously false or suspicious information provided by the debtor in deciding to extend credit.  Rather, the record shows that NCB gathered a substantial amount of apparently reliable documentation to verify the information Holmes had submitted in his loan applications.  NCB's reliance was justifiable under *Field* .

*Holmes' Knowledge of Material Misrepresentations*

Holmes next argues that the Bankruptcy Court erred in concluding that no genuine factual dispute exists as to whether he "obtained money through a material misrepresentation that, at the time, [he] knew was false or made with gross recklessness as to its truth," as required by *In re Rembert*, *supra*, 141 F.3d at 280.

As noted above, the Bankruptcy Court found that Holmes made material misrepresentations in four loan-related documents.  In the application for the $500,000 loan, the

15

court found that Holmes misrepresented his address, the length of time he had lived there, his employer, the length of time he had worked there, and his gross monthly pay.  In the equity reserve agreement regarding the $500,000 loan, the court found that Holmes misrepresented his intention to repay the loan. And in the two mortgages which secured the two loans, the court found that Holmes misrepresented his ownership of the Rochester Hills property.

These findings are amply supported by the record.  Holmes admits he signed the "Direct Credit Application" for the $500,000 line of credit.  He gave as his address 2785 Cranbrook Ridge Ct., and indicated he had lived there for six months, although he later admitted he has never lived there.  He indicated he was making monthly payments for this property in the amount of $21,759.82, although he later admitted he never made any such payments and never had the ability to do so.  He gave as his previous address 3940 Laplaya Lane, Orchard Lake, Michigan, and indicated he had lived there for two years prior to living at 2785 Cranbrook Ridge Ct., although he later admitted to the FBI (*see* fn. 12, *infra*) that he never lived there.  He indicated he worked for Lion Pride Investment Group, and that he had worked there for five years, earning monthly gross pay of $183,900, although he later admitted that he had never worked there, that he had never earned anything close to this salary, and that he actually was earning $50,000 per year as a personal trainer at a gym.

Holmes also admits he signed the "Equity Reserve Agreement," which sets forth the terms and conditions of the $500,000 line of credit.  Among other things, Holmes agreed to the following:

> Security Interests.   Your Line will be secured by a mortgage (Mortgage) on your dwelling (Dwelling).  If the Dwelling is your primary or secondary residence, you represent and warrant to Bank that at all times during the term of this Agreement your Dwelling ...

16

shall be occupied by you and shall not be used as rental property....
You must not adversely affect Bank's interest in the Dwelling by an
action or inaction.  You must keep the Dwelling in good condition,
promptly pay all mortgages and other liens against the Dwelling, and
promptly pay all taxes and assessments on the Dwelling. . . .

Property Insurance.  You must keep the Dwelling fully insured
against loss or damage on terms that are acceptable to Bank to the
extent permitted by law. . . .

\*    \*    \*

Payments.  Your payments will be due monthly. . . . You are required
to pay a minimum payment by the Due Date shown on your statement
equal to the sum of the Line Minimum Payment and the FRL
Minimum Payment for each FRL in use.

\*    \*    \*

Other Provisions. You shall promptly notify Bank of any change in
circumstances which has a substantial adverse effect on your credit.
. . .

\*    \*    \*

Address of Dwelling: 2785 CRANBROOK RIDGE CT
ROCHESTER HLS   MI   48036

By signing this document, Holmes represented to NCB that 2785 Cranbrook Ridge Ct. was his

dwelling and that he lived and would continue to live there, although he later admitted he never lived

there; that he would "promptly pay all mortgages," although he later admitted he never made any

mortgage payments, never intended to make any mortgage payments, and had no ability to make any

mortgage payments, on this property; that he would make the minimum monthly payment on the

loan monthly, although he later admitted he never intended to make any payments and had no ability

to make any payments on this loan.

Holmes also admits he signed the "Future Advance Mortgage" that gave NCB a

mortgage in 2785 Cranbrook Ridge Court to secure the $500,000 loan.  Among other things, Holmes

agreed to the following:

> 5. PAYMENTS.  Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.
>
> 6. WARRANTY OF TITLE.  Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument . . . .
>
> \* \* \*
>
> 8. CLAIMS AGAINST TITLE.  Mortgagor will pay all taxes, assessments, liens, encumbrances, . . . relating to the Property when due. . . .
>
> \* \* \*
>
> 10. PROPERTY CONDITION, ALTERNATIONS AND INSPECTION.  Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. . . . Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent.
>
> \* \* \*
>
> 19. INSURANCE.  Mortgagor shall keep Property insured against loss by fire, flood, theft and other hazards and risks . . . .
>
> \* \* \*
>
> SIGNATURES: By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments.

The "Future Advance Mortgage" that secured the $800,000 loan, which Holmes also admits having

signed, contained similar provisions:

> By Jon T. Holmes, a single man, whose address is 2785 Cranbrook Ridge Court, Rochester Hills, MI . . . .

18

\*   \*   \*

TO SECURE the performance of the covenants and agreements herein contained, and the payment when the same shall become due, of the principal sum of EIGHT HUNDRED THOUSAND DOLLARS ($800,000), according to a Note of even date herewith dated October 11, 2005 executed and delivered to Mortgagee by Mortgagor . . . .

\*   \*   \*

Mortgagor hereby covenants, warrants and agrees as follows:

1. To pay or cause to be paid the sum of money mentioned in the Note, and the interest thereon, and to also pay or cause to be paid, the Indebtedness at the time and in the manner described in any document, instrument or agreement evidencing same.

\*   \*   \*

3. So long as any part of the Indebtedness shall be unpaid: To remove from said premises all statutory lien claims; to protect the title and possession of said real estate; and to pay when the same shall become due . . . all taxes and assessments, . . . upon said real estate . . . .

4. To . . . keep the building thereon and equipment in good repair, ...

By signing these documents, Holmes represented that he owned 2785 Cranbrook Ridge Ct., although his acquisition of that property was itself the result of fraud[12]; that he lived at this address, although

---

[12] Attached to Holmes' response to NCB's summary judgment motion is an affidavit of FBI Special Agent John J. Ryan, which was filed in this court on December 19, 2006, in support of a criminal complaint in *United States v. Phillip Blevins*, 06-CR-30555. Ryan, whose affidavit Holmes appears to have adopted *in toto*, averred in relevant part:

FRAUDULENT MORTGAGE LOAN
2785 CRANBROOK RIDGE, ROCHESTER HILLS, MI

8. I reviewed the mortgage file from Bank of America for the loan a buyer obtained to purchase 2785 Cranbrook Ridge Ct., Rochester Hills, Michigan. The review of the loan file revealed that the buyer

19

purchased the property for $5,400,000 from the sellers. The settlement statement indicated that on August 5, 2005, the buyer obtained a mortgage from Bank of American in the amount of $3,780,000. . . .

9. I reviewed the loan application that was submitted to Bank of America on behalf of the buyer. The application stated that the buyer was employed by Lion Pride Investment Corp as director of operations with a monthly income of $183,885.99. The loan application listed the buyer's home address as 3940 Laplaya Lane, West Bloomfield, Michigan.

10. On April 27, 2006, the buyer was interviewed by the FBI. The buyer said that he was employed by Life Times Fitness as a physical trainer at the time he applied for the mortgage on 2785 Cranbrook Ridge Ct. At that time the seller was a client of the buyer. The buyer said the [sic] he was introduced to PHILLIP BLEVINS by the buyer's brother. The buyer introduced BLEVINS to the seller. During that initial introduction, the seller told BLEVINS he was trying to sell his house. In the buyer's presence, BLEVINS responded by telling the seller that he could arrange for the sale of the seller's house. Later, BLEVINS asked the buyer if the buyer would buy the 2785 Cranbrook Ridge Ct. [sic]. BLEVINS said since the buyer had good credit, BLEVINS could arrange for the buyer to finance the purchase of 2785 Cranbrook Ridge Ct. The buyer stated that BLEVINS told him that the mortgage broker would use stated income on the loan application to qualify the buyer for the mortgage. The buyer advised that his income, while he was working at Lifetime Fitness, was about $50,000 per year. The buyer stated he was never employed by Lion Pride Investments, nor did he ever make $183,900 per month as stated on the Bank of America mortgage application. The buyer stated that he was told by BLEVINS that in order to apply for the mortgage the application would have to state that he (the buyer) worked for Lion Pride Investments. The buyer advised he asked BLEVINS if this was legal and BLEVINS assured him it was legal. The buyer said that he did not live at 3940 Laplaya Lane, West Bloomfield, Michigan as stated on the loan application. The buyer also said that he did not provide any money for a down payment....

The complaint in the 06-30555 matter was dismissed without prejudice in June 2008. The same month, an indictment was returned in *United States v. Phillip Blevins, et al.*, 08-CR-20339, alleging that Blevins and four others conspired to commit several acts of mortgage fraud, including the

this was never true; that he would make all loan payments and mortgage payments when due, although he later admitted he never intended to make any of these payments and had no ability to make them.

On this record, the Bankruptcy Court did not err in concluding that Holmes made many material representations to NCB in connection with the loan applications and that he was either aware they were false or grossly reckless as to their truth.[13]   Holmes has admitted that he signed the documents summarized above, although he claims he did not read them prior to signing. As the Bankruptcy Court correctly noted at the hearing, it is reckless in the extreme for a person to sign any documents without reading them, or to sign blank documents, especially documents such as these which obligated the signer to repay very substantial sums of money.  *See, e.g., In re Coughlin*, 27 B.R. 632, 636 (BAP 1st Cir. 1983); *In re Copeland*, 291 B.R. 740, 765 (Bankr. E.D. Tenn. 2003); *Matter of Archer*, 55 B.R. 174, 179-80 (Bankr. M.D. Ga. 1985).  This degree of recklessness satisfies the requirement of *In re Rembert*, *supra*, 141 F.3d at 280, that Holmes knew the misrepresentations were false or that he made them with gross recklessness as to their truth.

The court also affirms the Bankruptcy Court's conclusion that the misrepresentations

---

purchase of 2785 Cranbrook Ridge Court.  While not named as a defendant, Holmes is identified as the straw buyer who was paid $20,000 for his assistance in carrying out the scheme.

[13] While Holmes would not directly admit that he signed the note for the $800,000 loan, a copy of which was attached to NCB's Request to Admit No. 3, his hesitation apparently lay in the fact that his signature was cut off in photocopying.  While first saying he could not admit or deny having signed, Holmes then indicated "he did not read the document prior to signing it," thereby acknowledging he had signed.  In this note Holmes made additional material misrepresentations, namely, that his address was 2785 Cranbrook Ridge Court, that "all information you provide to Bank is true and complete," and that Holmes would "keep the Property insured and in good condition and will promptly pay all taxes and license fees, and all repair, maintenance and preservation costs pertaining to the Property."

at issue in this case are "other than a statement respecting the debtor's . . . financial condition," as required by § 523(a)(2)(A).  The quoted phrase has been interpreted narrowly by the Bankruptcy Appellate Panel of the Sixth Circuit to mean "statements that are made regarding a debtor's overall net worth, assets and liabilities."  *In re May*, 2007 WL 2052185, at *7 (BAP 6th Cir. July 19, 2007). As correctly noted by the panel in that case,

> In fact, "if the phrase 'respecting the debtor's ... financial condition' were given a broad reading, the resulting exclusion might eliminate coverage for many misrepresentations typical of the common-law torts that *Field* represents as lying at the heart of [§ ] 523(a)(2)(A)." *Joelson*, 427 F.3d at 710 (citing *Field*, 516 U.S. at 68-69) (explaining that § 523(a)(2)(A) refers mainly to common-law torts set forth in § 523(a)(2)(A)). A broad interpretation of the phrase "concerning the debtor's ... financial condition" would allow debts incurred as a result of these common-law torts to be dischargeable. *Joelson*, 427 F.3d at 710. That result is not in line with the Court's analysis in *Field*. See *id.* at 710-11.

*Id.*  The court adopts this interpretation of the statutory phrase.  As none of Holmes' misrepresentations regarded his "overall net worth, assets and liabilities," they are not excluded from consideration under § 523(a)(2)(A).

### *Intent to Deceive*

Finally, Holmes argues the Bankruptcy Court erred in deciding on summary judgment that he had the requisite intent to deceive NCB.  "Whether a debtor possessed an intent to defraud a creditor within the scope of § 523(a)(2)(A) is measured by a subjective standard, . . ."  *In re Rembert*, 141 F.3d at 281 (citation omitted).  "[T]he proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt." *Id.*  "A debtor intends to deceive a creditor 'when the debtor makes a false representation which the debtor knows

or should have known would induce another to advance goods or services to the debtor." *In re Copeland*, 291 B.R. 740, 765-66 (Bankr. E.D. Tenn. 2003), *quoting In re Patrick*, 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001).

In the present case, Holmes' entire argument on this issue boils down to his assertion that he "believed Phillip Blevins and his business, Lion Pride Investments, would pay the monthly note on the house, and then after a year the house would be 'flipped' for a profit." That is, Holmes suggests he did not intend to defraud NCB because he believed Blevins would make the payments.

This admission by itself conclusively establishes that Holmes did not intend to repay these loans, as the Bankruptcy Court correctly found. Holmes represented to NCB that *he*, not Blevins, owned and lived at 2785 Cranbrook Ridge Ct.; that *he*, not Blevins, had worked at Lion Pride Investment Group for five years and was earning a monthly salary of $183,900; that *he*, not Blevins, was making monthly mortgage payments on the house in the amount of $21,759.82 and that he would continue to do so; that *he*, not Blevins, was giving the bank a mortgage on the house to secure the loans; and that *he*, not Blevins, was promising to repay these loans. As noted above, the Sixth Circuit has held that the proper inquiry is "whether *the debtor* subjectively intended to repay the debt," *In re Rembert*, 141 F.3d at 281 (emphasis added), not whether the debtor believed *someone else* might repay the debt.

The Bankruptcy Court properly rejected Holmes' argument that, under *In re Rembert*, he lacked fraudulent intent because he believed Blevins was going to "flip" the Rochester Hills house, make a profit, and repay the loans. Holmes' reliance on *In re Rembert* is misplaced. In that case, the debtor took several thousand dollars in cash advances on a number of credit cards and gambled the money away. She repaid some of this money, including by borrowing against her

23

home, but eventually sought to discharge approximately $11,500 in credit card debt. The court of appeals affirmed the district court's finding that the debtor lacked intent to deceive the creditors, based in large part on the fact that the debtor made substantial payments to reduce the balances before filing for bankruptcy. The court found that this "conduct was entirely consistent with a subjective intent to repay Appellants," despite the unreasonableness of her belief that she could gamble her way out of debt. *Id.* at 282. By contrast, Holmes' conduct is entirely consistent with a subjective intent to defraud NCB and to never repay either loan. Holmes has admitted as much, as he believed at best that someone else (namely, Blevins) would repay the loan if the Rochester Hills house could be flipped.

The factually more analogous case is, as the Bankruptcy Court correctly noted, *In re McManus*, 292 B.R. 157 (Bankr. E.D. Mich. 2003). In that case, the debtor acted as a straw buyer of a luxury automobile on behalf of third parties. Debtor signed a purchase agreement, obligating her to pay principal and interest over a 60-month period. She turned the car over to the third parties who had told her they would make the payments. When they failed to do so, the creditor demanded payment from the debtor, who sought to discharge the debt in bankruptcy. In finding the debt nondischargeable under § 523(a)(2)(A), the bankruptcy court stated:

> [The debtor] claims that she naively assumed that either Matthews, Jonavanic or Bullseye would repay the debts on the vehicles. Perhaps that is so, but that assumption neither explains her accepting $500 per transaction nor reduces her own deceptive intent. In fact, it establishes it. *Her belief that someone else was going to pay the debt establishes her deceptive intent in representing that she intended to pay.*
>
> McManus's position here is that she is as much a victim of this fraud as HNB. She argues that when HNB contacted her about the payments, she went to the police to report the fraud. However, in light of the evidence establishing her own intentional false

> representation and her own intent to deceive, the Court simply cannot
> agree that she was a victim. She willingly participated in a scheme to
> defraud HNB.

*Id.* at 159 (emphasis added). The same reasoning applies in the present case to establish Holmes'

fraudulent intent. Holmes applied for and received large amounts of money, using false information

about his employment and assets, knowing all the while the he would not and could not repay the

loans, but, just as the debtor in *In re McManus*, believing perhaps that someone else would repay

them. Holmes is not a victim, but a willing participant in a fraudulent scheme. If his co-conspirators

have left him holding the bag, his remedy is to sue them, not to dodge the debt by seeking to have

it discharged in bankruptcy. Under these circumstances, Holmes' fraudulent intent is established.


### *Conclusion*

For the reasons stated above, the court affirms the Bankruptcy Court's conclusions

that NCB has proved all elements of *In re Rembert* by a preponderance of the evidence and that the

debts at issue in this case are therefore nondischargeable pursuant to § 523(a)(2)(A). Holmes made

many material misrepresentations relating to his income, employment, assets, and ownership of the

Rochester Hills house, all of which he knew were false or, to the extent they were made on forms

he did not read or signed in blank, he made with gross recklessness. Holmes clearly intended to

deceive NCB, as he has admitted he never intended to repay the loans but believed they would be

repaid by others. NCB justifiably relied on the false representations, as it did not rely on them

blindly but gathered a substantial amount of supporting documentation before extending the loans.

The NCB's reliance was the proximate cause of its loss, as the loans would not have been made had

Holmes not submitted the fraudulent loan applications, signed the notes, and given the Rochester

Hills property as security.  The Bankruptcy Court's grant of summary judgment is therefore

AFFIRMED.


                                        S/Bernard A. Friedman_____
                                        BERNARD A. FRIEDMAN
                                        SENIOR UNITED STATES DISTRICT JUDGE

Dated:  February 13, 2009
          Detroit, Michigan


26